### 17636

Grady Elmer PRINCE, by G. A. L.; Catherine B. Prince, Adm'x; Michael Elmer Prince, *et al.,* by their G. A. L., Respondents, v. C. Y. THOMASON COMPANY and American Motorists Insurance Company, Appellants.

(113 S. E. (2d) 742)

*Messrs. Rainey, Fant, Traxler & Horton,* of Greenville, *for Appellants,*

*Messrs. J. Perrin Anderson* and *Marvin R. Watson,* of Greenwood, *for Respondents,*

April 5, 1960.

TAYLOR, Justice.

This is a Workmen's Compensation Case.

Shortly after 6 o'clock A. M. on December 30, 1957, while on his way to work at Ninety Six, South Carolina, in his 1950 Chevrolet pick-up truck, Grady E. Prince, a resident of Calhoun Falls, South Carolina, sustained an injury by accident on State Public Highway No. 72, between Calhoun Falls, South Carolina, and Abbeville, South Carolina, some thirty miles from the job site at Ninety Six and was carried to the hospital unconscious.

On April 18, 1958, and while Grady E. Prince was still unconscious, a hearing was held at Abbeville, South Carolina, to determine whether the accident and resulting injuries arose out of and in the course of his employment so as to come within the provisions of the South Carolina Workmen's Compensation Laws, Code 1952, § 72-1 *et seq.*

An Opinion and Award was filed by the single Commissioner awarding Workmen's Compensation benefits to an appropriate committee to be appointed and qualified by a Court of competent jurisdiction to act in behalf of Grady E. Prince, a person declared by the Award to be *non compos mentis.* This Opinion and Award was affirmed by the Full Commission on September 12, 1958.

While the appeal of Appellants from the Award of the Full Commission was pending before the Circuit Court for Greenwood County, Grady E. Prince died intestate on September 25, 1958. On September 30, 1958, Honorable Thomas P. Bussey, Presiding Judge, remanded the matter to the Industrial Commission to determine the status of the present award as well as who are now the beneficiaries and recipients and "to take such evidence and make such findings and conclusions as the said Commission may deem necessary and appropriate and to consider any other questions that may arise under the Workmen's Compensation Laws."

Additional evidence was taken before a single Commissioner at Greenville, South Carolina, on October 31, 1958, after which he filed another Opinion and Award dated January 13, 1959. This Opinion and Award was affirmed by the Full Commission on April 1, 1959.

Appellants again appealed to the Circuit Court for Greenwood County. On May 5, 1959, and within the thirty days provided by Statute, Honorable Bruce Littlejohn, Presiding Judge filed an Order sustaining the awards of the Commission with the exception of an award to the widow for nursing services rendered the deceased prior to his death, which was set aside.

From this Order, Appellants now appeal to this Court from that portion of the Award of the Commission which said Order affirmed. Respondents also served notice of their intention to appeal from that portion of Judge Littlejohn's Order which disallowed the award by the Commission to Mrs. Prince of her claim for nursing services rendered the deceased prior to his death, but by agreement between the parties, the appeal of Catherine B. Prince from the disallowance of her claim for nursing services will be postponed until after the appeal by the defendants has been disposed of.

At the time of injury and subsequent death, the deceased, Grady Prince, was employed by the C. Y. Thomason Company as general superintendent with the duty of superintending one or more jobs at the same time and seeing that such jobs were carried to a satisfactory completion, traveling back and forth between the construction sites wherever they might be. He assisted in submitting estimates and bids. At times, he purchased or transferred materials from one job to another, attended ground breaking ceremonies, etc., and generally did what was necessary to expedite such construction as the Company might be engaged in at the time, using a Chevrolet pick-up truck in the performance of these duties.

Mr. C. Y. Thomason, Jr., Vice-President of the Company, testified as follows as to the policy of the Company with respect to the use of the pick-up truck:

"Mr. Anderson: Now, Mr. Thomason, I want to ask you if you know what vehicle Mr. Prince was using? A. He was using a Chevrolet pick-up truck.

"Q. Will you state whether or not that truck was registered in the name of your company or in the name of Mr. Prince, and just what the circumstances were with respect to the operation and expense of operating the truck? A. We have—I would like to briefly state our company policy. We have two options for our superintendents. We either furnish them with a company owned pick-up truck, which we have to use on the job or we, if the superintendent wishes to furnish his own vehicle, we pay him rental and put the gasoline in it and pay all repairs, keep it up for him, and in return for that he is to use it in any way we deem necessary; in other words to haul men and materials and what have you. In this case we were paying Mr. Prince rental on the truck and furnishing gasoline and keeping up the repairs on it.

"Q. The rental which you paid Mr. Prince on the truck and gasoline and the repairs to the truck was over and above this straight salary of a Hundred and Five Dollars a week; is that correct? A. Yes, sir.

"Q. Now, in this case had you been paying Mr. Prince a rental for the use of the truck? A. Yes, sir, we had."

* * *

"Mr. Anderson: Now, Mr. Thomason, state again—withdraw that. Mr. Thomason, I believe you stated that these represent rental for the—to Mr. Prince for the truck which he was to use for what purpose? A. Well, for any purpose that would benefit the job as needed. If we needed to haul— well, he hauled men from job to job or pick up materials or small tools. He occasionally carried small tools from job to job, instruments and sometimes a bag or two of mortar mix, just light materials and hauled labor occasionally.

"Q. Can you—will you tell us how the agreement as to Mr. Prince—as to furnishing Mr. Prince gasoline and oil and repairs, how was that handled? A. Well, we had the repairs done at our shop. We have a full time shop which is

owned by C. Y. Thomason Company, and we handle the repairs in there. Now, we also own a petroleum products, which is Amoco Distributorship, and we made arrangements for him to sign for what gasoline he needed at any of our Amoco Stations or the plant. If need be, I might add this. They have the tickets available that he signed at Petroleum Products in Greenwood for his gasoline.

"Q. Now, you have stated that it was the policy—that your company had a policy of granting the option either to a superintendent that the company would furnish him a truck—purchase a truck and furnish it to him, or furnishing —or the superintendent using a truck which he had owned and paying him a rental. Was that option given to Mr. G. E. Prince? A. Yes, it was.

"Q. Mr. Thomason, did Mr. Prince's duties require him to report to the office of C. Y. Thomason Company at Greenwood where your personal office is from time to time. Answer that question first. A. Yes, as a rule my procedure would be to try to check with him on the job once a week, and he would try to check with me once or twice a week with things that we both had to go over; things that he couldn't handle from the field that I had to take care of.

"Q. State whether or not on any such occasion it would be either after the job on which he was supervisor had closed down for the afternoon, or prior to reporting to that job on his way to work in the morning? A. It was after work when he left the job to close down for the day that he would check with me."

The C. Y. Thomason Company had contracted to build Duke Street Church at Ninety Six, South Carolina, and had moved some material and equipment to the site the week immediately preceding Sunday, December 29, 1957 at which time the ground breaking ceremonies were held. Actual work was to have begun the next morning, Monday, December 30. In respect to this, Mr. C. Y. Thomason, Jr., further testified that he and Mr. Prince attended this ground breaking ceremony and construction was actually to begin

the following morning with Mr. Prince in charge. A portion of his testimony in respect to this is as follows:

"Q. For the church at Ninety Six, the Ninety Six Duke Street Church job was just being commenced; is that correct? A. Well, we had actually moved in some material and equipment the preceding week, but we had not broken ground. They requested that they have the ground breaking ceremony before we actually moved any dirt on the job or doing the actual work, but we had moved in the previous week.

"Q. What was to be done on the Monday morning that Mr. Prince got injured on his Ninety Six church job? A. Well, he and I discussed it a little that afternoon, and his crew was to set batter boards for the footings that day, dig holes and put posts in it and set these parallel boards called batter boards, and he was to meet with Emmett Davis, of Davis and Floyd, the engineering crew, which was to actually put the stakes in the corners, and then Mr. Prince's crew was to set the batter boards.

"Q. For the purpose of setting those batter boards or laying out the—that is for laying out the foundation, the place of the foundation, is it? A. Yes, sir.

"Q. For that purpose is a set of post hole diggers necessary, useful? A. Yes, sir and we set these at each corner. I might elaborate just a little if I may. In each corner of the building you set three four by four posts in the ground around your corner stakes and then you put a parallel board up to keep you lined so you can get the line of your footing, and that was what we would do that day."

The deceased left his home early on Monday morning, December 30, 1957, driving the pick-up truck. Shortly thereafter, he was found lying unconscious in the highway leading to Greenwood by way of Abbeville. The C. Y. Thomason Company, his employer, owned and operated a building supply house in Greenwood and the necessary lumber for setting up the batter boards was to be acquired there. In the truck at the time were found post hole

diggers which he had secured from another construction job then in progress by the same company, also, twine and blueprints, including specifications of the job at Ninety Six, all of which were necessary to setting up the batter boards and the commencement of the work on the Duke Street Church. Deceased had no fixed situs of employment, but moved from place to place as his services were required by the Company which was engaged in construction work at different places. There were no eyewitnesses but he had been instructed to take charge of construction of the Duke Street Church, and there is an abundance of evidence to support the findings of the Commission that the injury and death of Mr. Prince arose out of and in the course of his employment.

Appellants further contend that the Award was based upon inadmissible and incompetent testimony, that one witness, Mr. Walter Spires was permitted to testify over Appellants' objection that on Friday at approximately 4:30 P. M., some three days before the accident that deceased did pick up post hole diggers and some twine and come by Greenwood to order some four by four timbers to complete the job of staking out and directed Spires to meet him at Ninety Six on Monday morning at 7 A. M. Further, that witness E. W. Jackson was permitted to testify over Appellants' objection that on the same day at approximately 3 P. M. deceased borrowed a pair of post hole diggers that he declared were to be used to lay out the job at Ninety Six on Monday morning. Appellants further objected to other questions and answers between the hearing Commissioner and C. Y. Thomason, Jr., Vice-President of the Defendant Company.

Appellants take the position that such testimony is inadmissible under *Ervin v. Myrtle Grove Plantation,* 206 S. C. 41, 32 S. E. (2d) 877, in that the statements made by the deceased were not made immediately prior to his departure and, therefore, should have been ruled incompetent. The testimony of witness Jackson to the effect that the deceased borrowed the post hole diggers under the

circumstances related is certainly competent as it was an act performed by the deceased in connection with the duties of and in the furtherance of his employment and was not merely a declaratory statement revealing his intentions thereabout. Whether the statements made by the deceased on Friday before the injury on Monday are competent or incompetent is not important here as there is an abundance of competent evidence to support the findings of the Commission and the questioned evidence at most is only cumulative.

Appellant next contends that even though the case be compensable the record does not support an award for medical bills beyond the ten weeks' period from date of injury. Section 72-305, Code of Laws of South Carolina, 1952, reads as follows:

"Medical, surgical, hospital and other treatment, including medical and surgical supplies as may reasonably be required, for a period not exceeding ten weeks from the date of an injury to effect a cure or give relief and for such additional time as in the judgment of the Commission will tend to lessen the period of disability, * * * shall be provided by the employer."

The first Award of the Commission found as fact "that such medical treatment and care after the first ten weeks from injury was such as would tend to reduce the period of disability," but it is apparent from the record that the question of medical benefits beyond the ten weeks' period was not under consideration at that time as is revealed by the following:

"Mr. Horton: * * * As we see it briefly at this stage, Mr. Commissioner, the only real issue is one of liability.

"Commissioner Reid: Yes, sir.

"Mr. Horton: As to whether or not Mr. Prince has sustained an injury by accident arising out of and in the course of his employment."     *   *   *

"Commissioner Reid: All right, gentlemen. Now, that narrows the issues to one of liability, specifically to whether

or not the employee-claimant, Grady E. Prince, suffered an accidental injury arising out of and in the course of the employment, and if so, the extent of disability and other disabling conditions for which he would be entitled to benefits under the Workmen's Compensation Law."

The finding of the Commission, therefore, in its first Award that "such medical treatment and care after the first ten weeks from injury was such as would tend to reduce the period of disability" was premature.

Pending appeal Mr. Prince died and the case was remanded for further consideration by the Commission. After further hearings, the Commission found as a fact that the medical care "had a tendency to restore him to good health." And there is no finding that such treatment in the judgment of the Commission would tend to lessen the period of disability. We are, therefore, of the opinion that the case must be remanded to the Circuit Court for the purpose of being in turn remanded to the South Carolina Industrial Commission with instructions that both Appellants and Respondents be permitted to offer testimony upon the question of whether the medical treatment beyond the ten wekes' period would in the judgment of the Commission tend to lessen the period of disability and that a determination thereon be made by the Commission.

Appellants present two other questions that upon oral argument counsel conceded were not of importance.

The Order appealed from is, therefore, affirmed except that portion which affirmed the award for medical benefits beyond the ten weeks' period, and the case is remanded for the purpose of taking testimony and making a determination thereabout. Affirmed in part; reversed in part.

STUKES, C. J., and OXNER, LEGGE and MOSS, JJ., concur.